

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-1995

# United States v Bass

Precedential or Non-Precedential:

Docket 94-5352

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"United States v Bass" (1995). *1995 Decisions.* Paper 93.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/93

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

No. 94-5352

----------

UNITED STATES OF AMERICA

v.

DANNY BASS,

Appellant

----------

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 93-00518-2)

----------

Argued Wednesday, January 25, 1995

BEFORE:  BECKER, LEWIS and GARTH Circuit Judges

----------

(Opinion filed April 14, 1995)

----------

Maria D. Noto
Amy B. Kershnar (Argued)
746 Highway 34
Matawan, New Jersey 07747
Attorneys for Appellant

Faith S. Hochberg
Victor Ashrafi
Allan Tananbaum (Argued)
Office of United States
    Attorney
970 Broad Street
Room 502
Newark, New Jersey 07102
Attorneys for Appellee

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

Danny Bass appeals the 37 month sentence imposed by the district court under the 1989 version of the Sentencing Guidelines (U.S.S.G. §§ 2K2.1 and 2K2.2) following his plea of guilty to charges of conspiracy to purchase and transport firearms in violation of 18 U.S.C. § 371 and 18 U.S.C. § 922(a)(5)-(6). Bass argues that the district court erred in three respects: (1) that the court clearly erred in finding that he was a "leader or organizer" as defined in U.S.S.G. § 3B1.1; (2) that the court impermissibly departed upward four levels when it held that Bass "should have been possessed of knowledge or had reason to believe that they [the weapons Bass purchased] would be utilized to commit other types of felony crimes," app. 123; and (3) that the court violated the Fifth Amendment's due process clause by sentencing him at the top of the sentencing range based on the court's belief that Bass perjured himself.

The district court had jurisdiction pursuant to 18 U.S.C. § 3551. We have appellate jurisdiction over the resulting sentence pursuant to 18 U.S.C. § 3742.

We find no merit in Bass' first and third challenges to his sentence and thus will affirm those aspects of the court's determination with only a brief discussion. Nonetheless, we conclude that the 1989 version of U.S.S.G. §§ 2K2.1 and 2K2.2

already took into account the foreseeable criminal use of the weapons sold in the conspiracy.  Because the guidelines do not permit an upward departure on this basis, we will vacate the sentence and remand for resentencing consistent with this opinion.

## I.

From late 1989 to October 1990, Danny Bass conspired with Milton Lodge, Sam Gilbert, Katrina Huskersen, Tim Crumm, and James Reid to buy firearms in Richmond, Virginia and to transport the guns for undocumented resale in Newark, New Jersey.  The conspirators performed various functions in this plan, including the solicitation of straw buyers in Virginia, the transfer of funds from New Jersey to Virginia to pay for the purchases, the purchase and transportation of at least 81 guns to Newark, New Jersey, and the subsequent sale of the guns in the Newark area. The weapons sold in the course of the conspiracy included an undisclosed number of automatic firearms such as "Tec-9s."  App. 54.

While the government presented no evidence that Bass purchased, transported, or sold firearms himself, the government produced evidence that Bass worked with Lodge and Gilbert to organize the New Jersey operation and that Bass assisted in the Virginia operation.  For example, Lodge testified that on at least two occasions he either delivered guns to Bass or notified Bass of the delivery of weapons in New Jersey.  App. 82-84; 77-80.  By means of various wire transfers and personal

transactions, Bass provided approximately $4,300 to $4,600 to Gilbert for the purpose of purchasing weapons in Virginia. App. 61-66. A government expert testified that this amount of money would purchase approximately 50 semiautomatic handguns in Virginia. App. 62. The record suggests that other monetary transfers occurred but the amounts transferred were not known.

Grand jury testimony of Katrina Huskerson, a straw buyer in Virginia, was submitted at the sentencing hearing. In addition to other testimony, Huskerson testified that Bass and Sam Gilbert purchased the most firearms during the conspiracy. App. 199.

On October 21, 1993, the United States indicted Danny Bass and Samuel Gilbert for conspiring to purchase firearms illegally and to transport them in interstate commerce in violation of 18 U.S.C. § 371 and 18 U.S.C. § 922(a)(5)-(6). Bass pled guilty to the conspiracy on the condition that the government not seek a two level upward adjustment for obstruction of justice.

At sentencing, the district court calculated Bass' base offense level as six under the 1989 version U.S.S.G § 2K2.1. The court adjusted the sentence upward six levels based on the number of guns involved in the conspiracy. The court adjusted the sentence downward two levels for acceptance of responsibility.

After a hearing, the district court found that Bass had bankrolled a substantial part of the conspiracy's firearm purchases and/or other expenses and directed a significant portion of the conspiracy's New Jersey operations. The court

thus found that Bass was a leader or organizer within the meaning of U.S.S.G. § 3B1.1 and adjusted the sentence upward an additional four levels.

The district court departed upward still another four levels because Bass "should have been possessed of knowledge or had reason to believe that [the guns] would be utilized to commit other types of felony crimes." App. 123. The court based this decision to depart upward on two factors. First, the court felt that the type of weapons sold in the conspiracy were "the favored weapons of the underworld." App. 119. Second, the court believed that the 1991 amendments to the guidelines, which now permit a four level adjustment in the offense level when "the defendant . . . possessed or transferred any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense . . .," U.S.S.G. § 2K2.1(b)(5) (1994), demonstrated that the 1989 guidelines did not take into account Bass' knowledge of the possible illegal uses of the firearms. The district court also noted that weapons attributable to the conspiracy had been linked to a police shootout and the murder of a New Jersey assistant district attorney.

Finally, the district court chose to sentence Bass at the top of the applicable sentencing range because the court found that Bass had perjured himself at an earlier suppression hearing.

Following these adjustments, the district court, having a range of 30-37 months from which it could sentence Bass, then

sentenced Bass to 37 months in prison and three years supervised release. Bass filed a timely notice of appeal.

## II

Bass argues that the district court clearly erred when it found that he was a leader or organizer of the conspiracy. We will not disturb the factual findings of the district court unless they are clearly erroneous. United States v. Ortiz, 878 F.2d 125, 126-27 (3d Cir. 1989). We must accept the district court's findings unless we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

U.S.S.G. § 3B1.1(a) instructs the district court to increase a defendant's sentence by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants . . . ." Application Note three of the 1989 guidelines instructs the court to consider the following factors in deciding whether the defendant is an organizer: the defendant's decision-making authority, the nature of the participation in the actual offenses, the recruitment of accomplices, the claimed right to a larger share of the proceeds, the degree of planning, the nature and scope of the illegal activity, and the degree of control exercised over others. U.S.S.G. § 3B1.1, App. Note 3; Ortiz, 878 F.2d at 127. The commentary to the guidelines purports only to suggest various factors the court should consider. Ortiz, 878 F.2d at 127. Evidence of every factor is not a prerequisite to a finding that

the defendant is a leader or organizer under § 3B1.1, nor is evidence that the defendant is the sole or predominate leader required. Id. The government need only show sufficient authority to justify such a finding. Id.

Bass premises his challenge primarily on the government's lack of evidence that he actually participated in the purchase, transportation, and sale of the firearms. Bass misunderstands the indicia of leadership under the guidelines. Leadership is not inconsistent with a refusal to participate in the actual implementation of a criminal plan. A person who plans, funds, and supervises a conspiracy's operation does not immunize himself from upward adjustment under § 3B1.1 just because he does not join in all of the mechanics and all of the various activities of the illegal enterprise. Indeed, leaders and organizers often distance themselves from the actual implementation of the conspiracy.

The fundamental question is whether adequate evidence supports the district court's determination that Bass participated in planning and organizing the crime. This record provides sufficient support for that conclusion.

The evidence presented at the sentencing hearing revealed that Bass bankrolled a large part of the gun purchasing operation. His contribution of approximately $4,300 to $4,600 was sufficient to account for the purchase of more than half of the weapons eventually traced to the conspiracy. Bass took possession of some of these weapons immediately when he was in Virginia. In at least two other cases, he assumed control over

weapons shipments upon their arrival in Newark.  Further, Bass admitted to identifying buyers for the weapons in New Jersey. This evidence, which provides a sufficient foundation to conclude that Bass had substantial control over the conspiracy's New Jersey operations, permitted the district court to find that Bass was a leader or organizer within the meaning of § 3B1.1.

## III

Bass next argues that the Sentencing Commission adequately considered the foreseeable consequence that firearms sold in violation of the National Firearms Act would be used in the commission of other felonies when it drafted the 1989 version of guideline § 2K2.2.[1]  He argues that the district court

---

[1].  U.S.S.G. § 2K2.1(c)(1), under which Bass was sentenced, required the district court to calculate a defendant's sentence by reference to § 2K2.2.  The 1989 version of U.S.S.G. § 2K2.2 reads as follows:

Unlawful Trafficking and Other Prohibited Transactions Involving Firearms

(a)  Base Offense Level

    (1)  16, if the defendant is convicted under 18 U.S.C. § 922(o) or 26 U.S.C. § 5861;

    (2)  6, otherwise.

(b)  Specific Offense Characteristics

    (1)  If the offense involved distribution of a firearm, or possession with intent to distribute, and the number of firearms unlawfully distributed, or to be distributed, exceeded two, increase as follows:

Number of Firearms        Increase in Level

. . .               . . .

therefore erred by departing upward an additional four levels in his case. Whether the Sentencing Commission adequately considered a factor in drafting a guideline is subject to plenary review. United States v. Uca, 867 F.2d 783, 786 (3d Cir. 1989).

The district court must sentence within the applicable guideline range and is not authorized to depart from that range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C § 3553(b). "In determining whether a circumstance was adequately taken into

(..continued)

       (F)     50 or more         add 6

  (2)    If any of the firearms was stolen or had an altered or obliterated serial number, increase by 2 levels.

  (3)    If more than one of the following applies, use the greater:

      (A)  If the defendant is convicted under 18 U.S.C. § 922(d), increase by 6 levels; or

      (B)  If the defendant is convicted under 18 U.S.C. § 922(b)(1) or (b)(2), increase by 1 level.

(c) Cross Reference

  (1)    If the defendant, at the time of the offense, had been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, apply § 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition) if the resulting offense level is greater than that determined above.

consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." Id. Here, the district court departed upward four levels because it held that the 1989 firearm guidelines, specifically U.S.S.G. §§ 2K2.1 and 2K2.2, "did not take into account the nature and the type of weapons transferred. One should have been possessed of knowledge or had reason to believe that they would be utilized to commit other types of felonies." App. 123.

The district court's conclusion conflicts with the analysis in two of our earlier opinions: United States v. Uca, 867 F.2d 783, 786 (3d Cir. 1989) and United States v. Kikumura, 918 F.2d 1084, 1104-07 (3d Cir. 1990).

In Uca, Uca and a co-defendant Hodzic attempted to purchase guns from a government sting operation in Pennsylvania for eventual resale and shipment to Albania for use in a private war. Following their convictions, the district court departed upward on the following grounds:

> There's no lawful purpose for these guns.
> We're not talking about one gun or two guns,
> we're talking about 56 untraceable handguns
> which translates in my mind to at least 56
> potential acts of violence in this country or
> in another country. The use of handguns,
> unlicensed handguns, causes the perpetuation
> of criminal activity of persons so inclined
> to rob, maim, start their own private wars,
> even drug wars in cities such as
> Philadelphia.

Id. at 786.  After examining the purpose and substance of
U.S.S.G. § 2K2.3,[2] we determined that "[c]learly, the Guidelines
contemplate unlawful intent" on the part of the defendants
transferring the firearms.  Id. at 789.  Because the guideline
took into account the likelihood that illegally obtained handguns
would be used in future crimes, we concluded that "[t]he intended
use of the guns is not a circumstance warranting upward
departure."  Id. at 790 (footnote omitted).

Kikumura involved the application of the firearms and
explosives guidelines to a defendant, Yu Kikumura, who was caught
with bombs which he had intended to use in a terrorist attack in
New York City.  The type of bomb seized would without question
have resulted in death or serious injury to the public.  Because
the district court concluded that the guidelines did not account
for Kikumura's specific intent to murder civilians, the district
court departed upward.  Kikumura claimed that Uca invalidated the
departure.  We distinguished Uca and disagreed.

In Kikumura, we read Uca as holding that the offense
levels provided in the Sentencing Guidelines already accounted
for a defendant's disregard for the likelihood that firearms
involved in a conviction would be used in later criminal
offenses.  Kikumura, 918 F.2d at 1109.  Nonetheless, we concluded
that neither Uca nor the guidelines accounted for the kind of

_____

[2].  U.S.S.G. § 2K2.3, the guideline applied in Uca, was a
predecessor to U.S.S.G. § 2K2.1 and § 2K2.2, the guidelines
applied here.  The substance of the two guidelines is nearly
identical.  The minor differences that exist have no effect on
this case.

specific intent to kill which Kikumura had shown.  Id.  To summarize, we decided that the guidelines' "base offense levels incorporate some presumption of intended unlawful use," but not a predetermined specific intent to kill.  918 F.2d at 1109.

In the present case, neither the district court nor the government identified any evidence which suggested that Bass knew of, or intended, any particular illegal uses for the weapons sold in the course of the conspiracy.  The district court departed upwards because Bass should have known that the guns would be used in future felonies.

The district court based its conclusion primarily on the fact that an undisclosed number of semiautomatic handguns and "Tec-9s" -- "the favored weapons of the underworld" -- were among the firearms sold in the conspiracy. App. 119.  While we can understand the district court's concern that these types of weapons are generally used for unlawful purposes, we do not believe that the mere identification of the type of weapons purchased and transported indicate that Bass' level of intent exceeded the mens rea present in Uca, which we found to have been adequately considered by the Sentencing Commission.

As additional support for its upward departure, the district court recognized that weapons attributable to the conspiracy had already been tied to other felonies in Newark. Newark police found at least one weapon, attributable to Bass, following a shootout between police and drug dealers, and another weapon, also attributable to Bass, was used to kill a New Jersey assistant district attorney.  The government however was unable

to show that Bass was in any way aware of these events or was associated with those who perpetrated the crimes.

We recognize that an analytical distinction exists between Bass' mens rea with respect to possible future felonies and the actual commission of those felonies. The propriety of an upward departure based on the actual commission of felonies using guns purchased during the conspiracy was not considered in Uca as no evidence of actual subsequent offenses was presented to the sentencing court. Nonetheless, this distinction is too tenuous to conclude that the sentencing guidelines permit a departure where a later gun-related felony is actually committed and preclude a departure in a Uca situation when no evidence of a later felony is considered by the district court. Hence, we will not interpret the 1989 guidelines as permitting a departure because felonies were ultimately committed while, at the same time, forbidding a departure because the defendant had reason to believe the guns would be used in the commission of future felonies.

Absent additional evidence of specific intent tying Bass more directly to the subsequent crimes, these tragic events only confirm the reality already taken into account by the Sentencing Commission's 1989 firearm guidelines -- that the illegal sale of guns always poses the risk that the guns will be used in other dangerous illegal activity.

The government sought to avoid our holding in Uca by reference to the Sentencing Commission's 1991 amendments to the

firearms guidelines.  In 1991, the Commission added U.S.S.G.

§ 2K2.1(b)(5) which reads:

> If the defendant used or possessed any
> firearm or ammunition in connection with
> another felony offense; or possessed or
> transferred any firearm or ammunition with
> knowledge, intent, or <u>reason to believe</u> that
> <u>it would be used or possessed in connection</u>
> <u>with another felony offense</u>, increase by 4
> levels.

(emphasis added).  This provision might have permitted a four

level adjustment if the court could have applied these later

guidelines.

The government argues that the 1991 amendments permit

us to affirm Bass' sentence on the basis of <u>United States v.</u>

<u>Joshua</u>, 976 F.2d 844 (3d Cir. 1992).  <u>Joshua</u>, under certain

circumstances, permits courts in this Circuit to consider

subsequent amendments to official guidelines commentary when

interpreting prior guidelines, even if the new commentary

conflicts with a panel's decision rendered prior to the

amendment.  <u>Id.</u> at 854-56.

The government's argument however is unavailing because

the 1991 amendment does not conflict with our conclusion in <u>Uca</u>

and <u>Kikumura</u> that the guidelines under which those cases were

decided presume some level of illegal use for the firearms

transferred.

The 1991 amendments involved more than a reexamination

of U.S.S.G. § 2K2.1.  The amendments represented the Commission's

efforts to consolidate U.S.S.G. §§ 2K2.1, 2K2.2, and 2K2.3 into a

single guideline, § 2K2.1.  Section 2K2.3 in the 1989 guidelines,

which was titled "Receiving, Transporting, Shipping or Transferring a Firearm or Ammunition With Intent to Commit Another Offense or With Knowledge that It Will Be Used in Committing Another Offense," sought to tailor a defendant's sentence to any known or intended uses of firearms. This guideline also applied to illegal transactions in firearms when, under 18 U.S.C. § 924(b), the defendant had "reasonable cause to believe that [a felony] is to be committed therewith." See Commentary to U.S.S.G. § 2K2.3 (1989).

An even earlier version of U.S.S.G. § 2K2.3 also took into account the defendant's knowledge or intent regarding the use of the weapons in future offenses. Section 2K2.3(c)(1) of the pre-1989 guideline read as follows:

> If the defendant provided the firearm to another for the purpose of committing another offense, or knowing that he planned to use it in committing another offense, apply § 2X1.1 (Attempt or Conspiracy) in respect to such other offense, if the resulting offense level is higher.

As this pre-1989 guideline language makes clear, the Commission contemplated the imposition of higher sentences when the defendant transferred firearms with intent or knowledge that they would later be used in other offenses. Both versions of § 2K2.3 thus reveal that the Sentencing Commission specifically considered the defendant's mens rea in setting the appropriate offense level.

The new § 2K2.1(b)(5) provision, rather than altering the substance of the 1989 version of § 2K2.1, continues a part of

the function that § 2K2.3 served in 1989.  As a result, the amendment does not by itself support a conclusion that the Commission, in drafting the 1989 guidelines, failed to consider the foreseeable illegal use of illegally obtained weapons.

Further, the instant case lacks some of the crucial factors, present in Joshua, factors that persuaded us to reevaluate our prior interpretation of the applicable guideline in light of the subsequent amendment.

Joshua involved a Sentencing Commission amendment which explicitly sought to clarify ambiguous, but unchanged guideline language by means of new commentary.  976 F.2d at 855.  Here, neither party has pointed to anything which suggests why the Commission sought to add § 2K2.1(b)(5) to the substance of the guideline.  In the absence of any language, provision or explanation which clarifies the Commission's intent when it added the "reason to believe" language in § 2K2.1(b)(5), we cannot know the thinking that gave rise to the amendment.  It may be that the amendment indicates that the Commission had not previously considered the question of the defendant's recklessness with respect to future crimes or it may be that the Commission simply changed the degree of punishment for a previously considered factor just as it did when it increased the base offense levels applied to some firearm offenses as a part of the 1991 amendments.  Compare U.S.S.G. §§ 2K2.1(a) & 2K2.2(a) (1989) with U.S.S.G. § 2K2.1(a) (1992).  Absent a clear intent on the part of the Commission to clarify a prior ambiguity and absent the type of clear conflict between our precedents and new Commission

action, which we discussed in Joshua, we have no occasion to reconsider our holding in Uca and our discussion of that holding in Kikumura.

For all of these reasons, we disagree with the government's argument that the Commission's 1991 amendment provides sufficient reason to reevaluate our controlling opinions in Uca and Kikumura, which we are duty bound to apply. See Third Circuit I.O.P. 9.1. Because the district court's departure conflicts with Uca, Bass is entitled to a four level reduction in his sentence.

IV

Finally, Bass argues that the district court violated his constitutional right to due process by sentencing him at the highest end of the sentencing range based on the district court's finding that Bass had perjured himself in a prior exclusionary hearing. We exercise plenary review over Bass' constitutional due process challenge, United States v. Barnhart, 980 F.2d 219, 222 (3d Cir. 1992), and conclude, as we have earlier noted, that Bass' argument lacks merit.

Recently, in United States v. Dunnigan, 113 S. Ct. 1111 (1992), the Supreme Court held that enhancement of a guidelines sentence for obstruction of justice under U.S.S.G. § 3C1.1 based on a district court's finding that the defendant perjured himself did not violate the Constitution. The Court wrote:

> In the present context, . . . the enhancement
> provision is part of a sentencing scheme
> designed to determine the appropriate type

and extent of punishment after the issue of guilt has been resolved. The commission of perjury is of obvious relevance in this regard, because it reflects on a defendant's criminal history, on her willingness to accept the commands of the law and the authority of the court, and on her character in general.

Id. at 1116. Accordingly, a finding of perjury can enhance a defendant's offense level in some contexts.

The Court in Dunnigan relied heavily on its opinion in United States v. Grayson, 438 U.S. 41 (1978). There, the Court held that increasing a pre-guidelines sentence following a finding of perjury did not violate the due process clause. The Court concluded that the risk that sentencing judges would improperly enhance sentences based on an unindicted offense did not outweigh the benefits of allowing the judge to consider all of the defendant's conduct when fashioning an appropriate sentence. Id. at 53-54.

While Bass' challenge is not controlled by either Dunnigan or Grayson, we are satisfied that the reasoning of both cases permits a district court to impose a higher sentence within the sentencing range on the basis of the defendant's perjury. If the district court can enhance the offense level based on a finding that the defendant perjured himself, a fortiori, the court can impose a higher sentence within the sentencing range based on a finding of perjury. The district court, having found that Bass had committed perjury, thus did not violate Bass' constitutional rights.

V

For the foregoing reasons, we will affirm the district court's decision to adjust Bass' sentence upward four levels under U.S.S.G. § 3B1.1 and to sentence at the top of the range based on the court's finding that Bass perjured himself. However, because the 1989 guidelines, as we interpreted them in United States v. Uca, 867 F.2d 783 (3d Cir. 1989), do not permit an additional upward departure based on the foreseeable use of the firearms purchased by Bass in the commission of felonies, we will vacate the district court's sentence and remand for resentencing consistent with the foregoing opinion.